Good morning. May it please the Court? Derek Meyer on behalf of the plaintiff, Appellant Kelly Brezoczky. I'd like to reserve five minutes for rebuttal. We're not here today to ask the Court to undermine the utility of letters of intent as recognized in the Rennick case. Instead, we're here asking the Court to apply the standards in Rennick and other California authorities. And the application of those to the Court's order granting summary judgment to Domtar. Rennick recognized that normally letters of intent are considered to be nonbinding unless other circumstances indicate. It also indicated that where a letter of intent may be considered binding, where other evidence suggests that it may be binding. Pretty tough when the letter of intent has built in a backdoor out. I agree if it was Butterfly Health that was the plaintiff here. But Ms. Brezoczky was not a party to the letter of intent. So in this particular case, we have Domtar and Butterfly Health entering into a nonbinding letter of intent. And this kind of gets us back to the Bustamante case, where is this an agreement to form and launch a company? Where the Court said, the Court looked at Bustamante's company and the company into it in Domtar's position said, no, this doesn't happen until we enter all the necessary agreements. So the real linchpin here seems to be what the individual status is versus the company. So I'd appreciate your view on that. Because you're saying, well, she's not a party to the letter of intent. She's a party to a side oral agreement. Is that a fair statement? Correct. And so what I would focus on is the divergence between the communications between Kelly and the Domtar executives and the letter of intent. So in Rennick, there was a handshake deal before a letter of intent that said it was nonbinding. Before I get to it, let me ask you about the background of this case. Brezoczky is a corporation. How big was it? How many? Is there anything in record about how many people were, you know, shareholders, how many employees, anything like that? It wasn't large. I don't know specifically in the record. You know, were the other officers, she was a what, CEO, right? Yes. Were there other officers? I believe there were. Was there anything in the record about anybody else from the corporation being in contact with Domstar in negotiating this letter of intent? Not that I recall. She's the sole contact between the corporation, between her corporation and Domstar, isn't she? For the most part. There may have been some underlying questions. There's nothing in the record about anybody else doing anything. Okay. So my question is, so, I mean, it's pretty clear she dealt with Domstar as a representative of the corporation, right? She did. That's pretty clear. She never said, well, at this point I'm speaking for myself. That never came up, did it? I believe it did. What did she say? There, well, for example, if you can ---- Show me in the record that says, no, I'm not speaking for my corporation. I'm speaking as an individual. Where did she ever say something approaching that? Well, what I was going to refer to was the communication from Domstar's, from the ---- Not from Domstar. From her. At this moment, I'm not thinking of anything. There is nothing, is there? So, you know, in this kind of situation, to me, first of all, it's a classic. It's almost like a conflict of interest to be pressing your own case when you're the sole representative of the corporation, and yet that's what you claim she was doing, and no one, she never told anybody about that. You don't address that in your brief at all, do you? Well, I'd like to back up a little bit. Actually, there were actions where Kelly was acting individually. For example, going to CNB and securing their consent to the letter of intent and the back-end note, which she was going to be liable for personally, as opposed to any corporation. So she was dealing with them. And, in fact, the ---- You're talking about the bank now. Yes. With them, I mean Domstar. Well, they also had Kelly sign a side letter individually. The bank asked both Kelly and Domstar to sign a side letter to use commercially reasonable efforts. Signed it individually. Yes. So it seems to me the only thing in the record was she, you know, it's clear there's some limited things they asked her to do individually, but otherwise, I mean, the fair reading of records, everything she did was as a representative of her corporation. Well, I would again go back to your question, Your Honor, which is there was a divergence between Domstar dealing with Butterfly Health. So when Domstar was dealing with Butterfly Health, it was very clear saying this is non-binding, and that's fine. But then at the same time, at the very same time, or the next day, Kelly writes to Domstar and says, we've achieved this important partnership step. And Domstar writes back, that's an important milestone. And then in April, there's a question of what ---- Now, let's stop right there. How does that change the picture in any way that she's really acting on behalf of the company that signed the LOI? Because Domstar and Butterfly Health were not partners. I understand that. But aren't they what they're working toward? I mean, partnership has different meanings. You know, there's the legal partnership, and then the let's have a partnership and move forward. And companies talk about partnerships all the time, even though they're not partners. Well, in this particular case, there's nothing where ---- so then following up, where Kelly ---- So right there, so far we don't have her somehow getting some agreement to her personally, correct? Well, we have the letter of intent. We have her declaration that they had an agreement that memorialized that the letter of intent ---- They. I'm sorry. We have a letter of intent in which Domstar and Kelly memorialized in Section 2 the terms of their joint venture. We have the March 30th communication where the parties acknowledge their partnership step, and it's an important milestone. We have the April 19th communications from Mr. Macris of Domstar where he says, there's no wavering one iota in our commitment to build the partnership. Right. I wrote that down, but then I wasn't ---- it doesn't seem to me the situation has changed at this point. Well, this gets into what inferences you draw from the evidence. This is on the summary judgment standards, drawing reasonable inferences in favor of Kelly. And here, we're saying this evidence shows that when Domstar is speaking with Kelly personally, that they're calling her a partner. Domstar fully knew how to use ---- They can't talk to a company. They have to talk to a person, don't they? Well, they could have talked to Butterfly Health's lawyers. Well, you know, that's the speculation outside the record. The fact is that she's representing Butterfly Health, correct? Yes, she's the CEO. Okay. And you're saying, well, they could have talked to the company's lawyers, but there's no evidence about that. They're talking to her. So Kelly had two roles here. She was going to be participating in the stalking horse bid with Domstar, and she was the CEO. And she went and got the board's approval to pursue that in her individual capacity. And those are in the record, those resolutions. And so the board knew, and certainly Domstar knew, that Kelly was pursuing this individually. And then so that takes us to the April 19th communications, the no wavering, one iota to build a partnership. And then we're excited to be your partner. We're 100% committed to the LOI. I mean, what does it mean to say you're 100% committed to a non-binding LOI when you're talking to a party that's not a party to the LOI? I'm missing you just a tad. Many of these discussions were between your client and workers in the organization, not the owner. What does the record show as to whether they had authority to speak for the corporation? These were extremely senior individuals. Mr. Fagan was a member of the management committee. For example, Fagan. He's the president of their personal care division. It's a $2.5 billion division. Yeah, I know he's a big man. He does big work. But under the law of the state of California, there has to be some documentation that he, through his office, can commit the corporation. And I don't see anything in the record on that. It sort of seems that there's a one-man shop that had a lot of good people around making him look better. But the actual owner, those conversations aren't the ones that you're referring to now. That argument was never raised by Domtar at all in the case regarding any authority of Mr. Fagan or Mr. Macris, who was the vice president of strategy and innovation. Well, it isn't a question of whether it was raised or not. It's your burden of proof to prove the connection. And it seems to me that I'm just having trouble. If Fagan comes out, he did say some things that if he were the owner, you'd have a pretty good case. But I don't see where, in this case, there's a showing that he had the right to bind the corporation by his conversations with your client. Could you help me with that point? Well, Domtar is a corporation. It can only speak through its officers. And this is one of the most senior officers in the company. Along with Mr. Macris, who's involved, whose role is vice president of strategy and innovation, this was an innovative product, and that's why they wanted to buy it. This was perfectly within their wheelhouse in terms of what they were trying to do to build their personal care division. So your argument is if a person is in charge of innovation, he, because of that reason alone, he can bind the corporation to anything he can speak for the corporation. Not necessarily innovation per se. I'm talking more about his seniority and the hierarchy of the company. This is a state case. It will go by the law of California. I didn't see this briefed. I mean, maybe I missed it, but I didn't see it briefed where the people who were speaking could bind the corporation by their comments with your client. That was not in the briefing. Okay. I'll reserve the rest for my rebuttal. Thank you. Good morning, Your Honors.  I'm Stacey Carpenter on behalf of Domtar Corporation. With me today is my colleague Noel Cohen as well. I'm going to pick up sort of where you left off in the beginning, and one of the issues in this case that is very difficult for the appellant is the fact that we do have a situation where there was a deal going on between two companies, and Ms. Brzozowski, of course, was representing one of the companies. At the same time that we've got this transaction between two companies that is well documented and with a lot of paper in the record, she claims that there's this side agreement going on that's an oral agreement that is not well documented in the record. And it creates just the conflict, Your Honors, we're talking about where who is she acting on behalf of and how do we interpret this communication when we don't know if it's a reference to partnership, the partnership between Butterfly and Domtar, or a reference between Ms. Brzozowski and this supposed oral agreement. It becomes even more difficult when we accept the fact that her answer to that, I think, is simple, and that is, well, there may be inferences to be drawn. Let this move away from summary judgment. I think the problem with that position is that you have to start from the point that the only direct evidence, and it's uncontested, Ms. Brzozowski points to the LOI to establish the material terms. So, of course, you have to start with the material terms, and as it was pointed out, those material terms are in a clearly nonbinding letter of intent. And it is clear from the letter of intent, both in its opening paragraph, where it says this nonbinding agreement about a potential transaction, as well as Section 7, which clearly designates which provisions are binding, which necessitates that the other ones are not binding. So Ms. Brzozowski likes to point to Section 2 of the LOI. There's no question but that Section 2 of the LOI is nonbinding. And while she likes to then back up and say I'm not a party to the LOI, the problem is, is that if those are the material terms of this supposed oral joint venture, then it's also a material term that it's nonbinding. You can't say Section 2 designates my material terms, but I'm going to ignore the material fact that Section 2 is nonbinding. Section 2 then, that nonbinding, becomes one of the material terms if this is going to be our only direct evidence of this oral agreement. The only other alternative explanation is that the nonbinding aspect of it is evidence, uncontroverted evidence, that Domtar had no intention to be bound. And we have to remember that when we put the facts of this transaction into perspective, it's uncontested that the purpose of the supposed joint venture was to obtain the assets of Butterfly One. When we have a situation where Domtar is not bound to obtaining the assets of Butterfly One, how can we possibly have a separate binding agreement for the formation of some joint venture, the only purpose of which is to obtain the assets Domtar has no obligation to obtain? Maybe you could answer in that regard the point that I was asking your colleague. There are some statements between representatives of your corporation that are pretty strong and might lead down the trail, but I never found out whether they had authority to bind the corporation. Is there anything in the record that tells us that one way or the other? In fact, it's the opposite in the record. If you look at the record at page 152, you will see that it's uncontested that the Board of Directors of Domtar had to approve this transaction. So ultimately, Mr. Fagan and Mr. Macris, while they're negotiating and making statements, they are not the ultimate decision makers and they ultimately cannot bind the company. This had to go to the Board of Directors, which had not happened and which was an unresolved contingency of this agreement. There was no – was there evidence of that in the record? Yes. At page 152, it's actually an uncontested fact in this case. Did the – I take it that the district court did not focus upon that. The district court did not focus on that. Instead, the district court's opinion was focused on two things. One was the district court focused on the fact that if the material evidence is going to be the LOI and it's nonbinding, this must be a nonbinding, even if there is a joint venture. The second aspect that the district court focused on is that once you start from the position of the nonbinding LOI, which is our material terms, then you've got your e-mails. What are the reasonable inferences that you can draw from those e-mails? And what the district court found is that in light of the situation where the material terms, even by Ms. Brzozowski's position, are from this nonbinding LOI, it is not a reasonable inference to then say that the communication between the people negotiating and the references to a future agreement or a future partnership or future getting this across the finish line, that it was not a reasonable inference to say that that then created a binding agreement. Okay. Let me go to one other point. It's been a long time since I practiced law in your position in California, but I have some memory decades ago. And in these contractual issues like this, there's very often the issue of good faith and fair dealing that comes up. Now, in this case, there was negotiations going back and forth. They were going to get the assets that were in bankruptcy and end up with—Kelly was But what happens is that your client sweeps in and grabs the whole asset and then she's outside. Was the—would that be—would there be a claim for good failure to proceed with good faith and fair dealing against your client? And if there was, was that raised in this case? So the issue of good faith and fair dealing has to turn initially on the finding of a contractual agreement. Once there's a contractual agreement, there's an obligation. If there's terms within the agreement that need to be resolved later on or behavior or things that need to be done, you need to act with good faith and fair dealing. In this instance where there's no actual agreement and when we start from the position of a nonbinding LOI, which allows the termination of the agreement, when you have it expressedly that you can terminate, you can't have a violation of good faith and fair dealing. Well, there is an agreement of a sort. There's a memorandum of understanding. That is something that they were working on. That was the basis of which they were going forward. And move the case forward so that your client could then move in and grab the assets. Isn't that sufficient to be in agreement, that there would be a claim for failure to observe good faith and fair dealing? No, Your Honor. Not when there's an express right to terminate. Because now we're talking about good faith and fair dealing between Domtar and Butterfly is what you're really talking about. Did Domtar have an obligation to negotiate in good faith and try to conclude the transaction with Butterfly? Was this raised at all in the district court by your adversary? Good faith and fair dealing? It was not as part of these summary judgment arguments. Okay. So beyond the... So I'm looking at the exclusivity provision. And as I understand it, that really relates to Butterfly not going outside of this deal without either notice or some other. Is that right? And it doesn't bind Domtar to anything? You are correct. It's a very common standard term in letters of intent that if we're actually, even though they're non-binding, if we're going to go down this road and spend the resources and time to go down this road, at the same time that you're courting us, you can't go out there and use the information and court somebody else. I mean, that's why these binding terms within here are the typical terms, which is if I'm going to spend money on this, I'll get reimbursed. We don't have a contract, but we have access to records and all the standard things one does in a transactional acquisition. So those are binding, but the so-called terms are not binding. That is correct, which is also very standard when you have letters of intent, and obviously even the title, Letter of Intent, sort of designates where you're going. It's an agreement to agree. And you're correct because you're going to spend the resources on it and the time on it. You're not allowed to court somebody else. You get expenses and things like that. This LOI is very specific also because it tells you which provisions specifically are binding, which, of course, necessitates that the other provisions are not binding. So when we look at the provision, the only one that's of issue here in this case, of course, is Section 2, because that's the only section that Ms. Brzozowski relies on for purposes of her material terms. And it cannot be contested, it's not contested that Section 2 is not within 3 to 9 and therefore is not binding in this case. Otherwise, I understand her argument. If we take everything you said, which is what's laid out in the LOI, we literally have to put that aside and then see what dealings there are between her and DOTMAR that might be leading to some kind of partnership or business relationship. And she says she's not asking us to decide that, she's just saying give her a chance to make her argument. Why not? The difficulty that Ms. Brzozowski has is that you can't put the LOI aside because if you just look at the actions and the e-mail communication and what we're doing to try to get across the finish line, you don't have the material terms of the agreement. This is the difficulty that she's trying to weave in this case. She has to go back to the LOI because she needs to establish the material terms of this supposed oral joint venture. The only thing, if you look at the e-mail, there's no terms in the e-mail. Why can't she? I think she does that. Certain terms of the LOI became a part of the oral agreement. Can't the parties agree to that side agreement without incorporating everything in the LOI? That is, in fact, what, of course, she is trying to do in this case. The problem is there are two problems with that. Number one, she says generally that Section 2 incorporates the material terms. Section 2, if you look at it by its very nature, explicitly is non-binding, so that gets incorporated. The other problem that that doesn't get over is that even if she could do that, even if you could parse out the LOI, pull out those material terms, ignore the fact that it's non-binding, you still have an issue in this case in that that gets you back to the Bustamante case and even the Pro Elite case, that appellant site. And in those cases, if you have an unresolved contingency that's material to the transaction or if you have future agreements that need to be resolved, you cannot have a binding agreement. We have that situation here because we have a situation where it's uncontested that the purpose of this alleged joint venture is to obtain the assets of Butterfly One. In order to obtain the assets of Butterfly One, and these are all uncontested facts, there had to be an asset purchase agreement, which was not done, and it's uncontested that drafts were circulated but negotiations broke down. You had to have approval. You had to be the highest bidder at the bankruptcy proceeding. You had to have approval by the bankruptcy court, and then you also had to have this approval by the Domtar Board of Directors. So just like in Bustamante where you couldn't possibly have this binding agreement for a future company until you have the funding secured, you can't possibly have a binding agreement for a company that's based on the Butterfly One assets until you've gone through these many steps that assure you're going to get the Butterfly One assets. Isn't the main step money, money to do it? And as I understand the record, there was approval by the major lender of the agreement. Does that interfere with your line of reasoning? It does not interfere with my line of reasoning because this was a special Section 363 bankruptcy transaction. Money is one issue. Conflict of interest is another issue, and as has been pointed out, there's the conflict of interest between Ms. Brzozowski being involved in the company and being involved as the CEO in Butterfly One. Those sort of conflicts of interest are major hurdles to get over in these types of transactions, which is why approval by the bankruptcy court is a significant unresolved contingency that leads to the conclusion that there's no mutual consent for all the terms because nobody knows if you're going to get the Butterfly One assets. And until that is resolved, you could not have a binding second agreement that is based solely on acquiring the Butterfly One assets. Couldn't you have a binding agreement that's subject to approval by the bankruptcy court? Wouldn't that be a binding agreement between their actions? So now you're writing in another term, which, of course, is now she's not, that's not her position. You have to keep in mind. Yeah, I understand that. Yes. So if you change the facts, and so if I think hypothetically, could we potentially have a binding agreement that is subject to? Well, then you're acknowledging the contingency. By its very nature, it's not binding because it's not binding if you don't get the assets. It is binding if you do. So what you're doing is you're splitting the binding nature and saying if this, then it is. If not, then it's not. But they did get approval for the assets by going to the major bank and getting approval of the deal. The bank had approval for them to go forward with the deal to resolve the debt. Nothing had been filed with the bankruptcy court. So we're far, we're, in this case, you have to have the asset purchase agreement first. We don't even have an asset purchase agreement. Then you've got to bid at the bankruptcy proceeding. Then you, even after you bid, if you're the highest bidder, you still need bankruptcy court approval. So we have many steps down the road that had not even been started and could not have been, nobody knows how they would turn out, and they are just the sorts of contingencies that the Bustamante court was talking about that prohibits you from then having a binding agreement. I'm out of time. Thank you, Ms. Carpenter. We'll hear a rebuttal from Mr. Meyer. Thank you. A few points in response to counsel's arguments. In terms of whether there's ambiguity over whether the parties were referring to each other as partners, both at the outset of this, at the outset of the negotiations, Fagan told Kelly, I will not, we will not buy these assets without you. And then later, on April 19th, they said, we are excited to be your partner. When they're saying we're excited to be your partner, they're talking about Kelly. They're not talking about Butterfly Health. Second, with respect to Cruz, which holds that where a party expresses a willingness to enter a bargain but indicates that further assent is required before there's a bargain, that's exactly what these e-mails are. When they say, yes, we're your partner, we're committed to this, we are unwavering commitment to this, that is a manifestation of assent, notwithstanding that the letter of intent is nonbinding. When we get to the Board of Director Approval, the Board of Director Approval relates to the 363 sale. There's evidence in the record in Kelly's declaration that nothing regarding their joint venture agreement was contingent on Board of Director Approval. Then when we get to their application of Bustamante, Bustamante wasn't talking about factual uncertainties. If that was the case, any lawyer who wanted to start a firm would not have a binding partnership agreement because there's uncertainties about how successful your practice is going to be. What Bustamante was talking about was if there's uncertainty in the terms, such that the court can't enforce the bargain, then it's indefinite. That's the contingency that was being expressed in Bustamante. And here there's only one open term, and it's the veto rights issue that we've addressed. They've alleged nothing that it would be unfair to enforce this agreement because of that open term. And, in fact, if you go and look at the markup of the operating agreement they provided, they were essentially in agreement there. So there's nothing unfair in enforcing this bargain. And your questions regarding the duty of good faith, that gets into the Boyd analysis and the breach of fiduciary duty, where the court held that, yes, there is a breach of fiduciary duty here. There may be some ambiguity over what the exact terms of the agreement are, but little formality is required. And a party cannot do what Domtar did here and say, I won't buy these assets without you, and then go and do that. So this is a case that should have gone to the jury. These e-mail communications give rise to inferences that Domtar intended to be bound and that it manifested its assent to the deal. And that's all we're asking, is the opportunity to present the case to a jury. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. The case of Brzozowski v. Datmar is submitted. We'll next hear argument in Telegram Messenger v. Lanta.
judges: Wallace, Tashima, McKeown